**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| DAVID ROWE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHANGE HEALTHCARE INC., a Delaware corporation, UNITEDHEALTH GROUP INCORPORATED, a Delaware corporation, UNITEDHEALTHCARE, INC., a Delaware corporation, and OPTUM, INC, a Delaware corporation,<br><br>Defendants. | ) | Case No.<br><br>**Class Action Complaint**<br><br>JURY DEMAND |

Plaintiff David Rowe, individually and on behalf of a class of all those similarly situated, alleges the following against Change Healthcare Inc., UnitedHealth Group Incorporated ("UHG"), UnitedHealthcare, Inc. ("UHC"), and Optum, Inc. (collectively "Defendants"), based, where applicable, on personal knowledge, information and belief, and the investigation and research of counsel.

## I. INTRODUCTION

1. This action arises out of Defendants' failure to implement adequate security measures to secure and safeguard Plaintiff's and Class Members' sensitive personally

identifiable information ("PII")[1] and protected health information ("PHI")[2] (collectively "Private Information") from an a targeted cyberattack on Change Healthcare Inc. ("Change") that was announced on February 21, 2024 ("Data Breach").

2. Change recognizes its responsibility to protect this highly sensitive Private Information. Its Privacy and Security website page largely mirrors regulatory requirements and federal security rules, further stating that "Change Healthcare is committed to the privacy and security of healthcare data and meets or exceeds HIPAA Privacy and Security Rule requirements."[3]

3. Change also recognizes that Private Information "can be an attractive target for criminal activity."[4] With respect to risk mitigation, Change claims that it was recognized as "Best Compliance & Ethics Program (small to mid-cap), and Compliance Department of the

---

[1] "Personally Identifying Information" is defined as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including a person's "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number; [u]nique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation; [u]nique electronic identification number, address, or routing code; or [t]elecommunication identifying information or access device (as defined in 18 U.S.C. 1029(e)). " 17 C.F.R. § 248.201(b)(8).

[2] "Protected Health Information" is the term used for individuals' health information by organizations subject to the Standards for Privacy of Individually Identifiable Health Information ("Privacy Rule") created by the Health Insurance Portability and Accountability Act of 1966 ("HIPAA"). It is defined as any information that is "created or received by a health care provider, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse" relating to "the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual." 42 U.S.C. § 1320d(4).

[3] Change Healthcare Inc., *Privacy and Security*, https://support.changehealthcare.com/customer-resources/hipaa-simplified/privacy-security (last visited Mar. 29, 2024).

[4] Tim Suther, *Data Use and Privacy Perspective: Keeping you Safe*, Change Healthcare Inc., https://www.changehealthcare.com/insights/data-use-and-privacy (last visited Mar. 29, 2024).

Year" in 2020, and that its "patent-pending Data Science as a Service [] environment offers 'always on' protections to help ensure privacy and security adherence."[5]

4. In the years leading up to the Data Breach, there were several highly-publicized warnings made by regulatory agencies regarding cyberattacks on healthcare organizations and the devastating impacts these attacks have on the healthcare industry.

5. Despite its alleged reputation and the prevalence of such warnings, Change failed to meet its responsibility to protect the Private Information of Plaintiff and Class Members, who entrusted Change – and, by extension, Defendants UHC, Optum, and UHG – with their most sensitive data, resulting in a massive Data Breach that compromised Plaintiff's and Class Members' Private Information and debilitated the healthcare industry.

6. As a result of the Data Breach, Plaintiff and the proposed Class Members are exposed to a significant risk of identity theft and have suffered and will continue to suffer injury.

7. Plaintiff brings this action against Defendants for their failure to properly secure and safeguard the Private Information of himself and all those similarly situated, seeking monetary damages, restitution, and/or injunctive relief.[6]

## II. PARTIES

8. Plaintiff David Rowe is a resident and citizen of Elizabethton in Carter County, Tennessee.

9. Defendant Change Healthcare Inc. ("Change") is a Delaware corporation headquartered in Nashville, Tennessee that provides payments and revenue cycle management,

---

[5] *Id*.

[6] Because only Defendants (as well as the cybercriminals who perpetrated the Data Breach) have knowledge of what information was compromised, Plaintiff reserves the right to supplement these allegations with additional facts and injuries as they are discovered.

connecting payers, providers, and patients within the United States healthcare system. It was acquired by UnitedHealth Group Incorporated in 2022 and markets itself as part of Optum, Inc.

10. Defendant UnitedHealthcare, Inc. ("UHC") is a Delaware corporation headquartered in Minnetonka, Minnesota. It is the insurance health benefits business arm of UnitedHealth Group Incorporated.

11. Defendant Optum, Inc. ("Optum") is a Delaware corporation headquartered in Eden Prairie, Minnesota. Optum serves healthcare industry customers via its three businesses: OptumHealth, OptumInsight, and OptumRx. On information and belief, Optum has been a UHG subsidiary since 2011.

12. Defendant UnitedHealth Group Incorporated ("UHG") is a Delaware corporation headquartered in Minnetonka, Minnesota, and is the parent corporation to Change, UHC, and Optum. UHG is regarded as America's largest insurer and one of the world's largest private health insurers, with $348 billion in annual revenues and serving 149 million members in all 50 states and 33 countries.[7] On information and belief, UHG operates and maintains several offices in Tennessee, including in Brentwood, Lenoir City, Kingston, Maryville, Columbia, Cordova, Smyrna, Gallatin, and Nashville.

## III. JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists, as at least one Defendant is a citizen of a State different from that of at least one

---

[7] Tom Hutchinson, *UNH- A Health Insurance Giant Benefitting from Rising Premiums, Acquisitions,* Yahoo! Finance: MoneyShow (Sep. 14, 2023), https://finance.yahoo.com/news/unh-health-insurance-giant-benefitting-095900663.html (last visited Mar. 29, 2024).

Class member. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

14. This Court has personal jurisdiction over Defendants because Change's principal place of business is in Nashville, Tennessee, within this District; each defendant is authorized to and regularly conducts business in the State of Tennessee; and each defendant intentionally avails themselves of Tennessee's markets by selling, marketing, and advertising its products and services to Class Members located in the State of Tennessee and within this District. Defendants therefore have sufficient minimum contacts to render the exercise of jurisdiction by this Court proper and necessary.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) through (d) because Change's principal place of business is located in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in, was directed to, and/or emanated from this District.

## IV. FACTUAL ALLEGATIONS

### A. Defendants Collect, Store, and Utilize Private Information, and Promise to Keep it Secure.

16. Founded in 2007, Change is a healthcare technology company that operates a platform facilitating connection and data transfer between providers, payers, and consumers.[8] As a part of its integration services, the platform receives, collects, maintains, and uses a sizable amount of Private Information, which is information that can be used to uniquely identify a specific person.[9]

[8] Sean Michael Kerner, *The Change Healthcare attack: Explaining how it happened*, TechTarget (Mar. 8, 2024), https://www.techtarget.com/whatis/feature/The-Change-Healthcare-attack-Explaining-how-it-happened (last visited Mar. 29, 2024).

[9] Change Healthcare Inc., *Code of Conduct* at 15, https://codeofconduct.changehealthcare.com/ (last visited Mar. 29, 2024).

17. Change's platform is one of the largest health information exchange platforms in the United States, managing approximately 15 billion claims per year, impacting an estimated one in every three patient records in the United States and totaling over $1.5 trillion.[10]

18. UHG is a multinational health insurance and services company with two primary business segments: UHC and Optum. These independent businesses serve different needs within the commercial health insurance marketplace. Where UHC is a health insurance business, Optum is a diversified health services company that provides expansive healthcare-related services to industry insurers, providers, state governments, and life-science companies.

19. In October 2022, UHG acquired Change, allowing it to merge Change with Optum, which would purportedly "connect and simplify the core clinical, administrative and payment processes health care providers and payers depend on to serve patients" with the stated goal of reducing costs and increasing overall efficiency of the entire healthcare system.[11] The Department of Justice (DOJ) opposed the merger on the grounds that it would threaten health insurance competition and competition for "vital technology" that insurers use to process claims by removing direct or horizontal competition from UHG's only major rival for such technology.[12] In its pretrial brief, UHG argued for the strength of its data protections, claiming that "UHG has a 23-year track record of ensuring that competitively sensitive information and personal health information are sufficiently protected…"[13] UHG promised that it "would

[10] Kerner, *supra* note 8.
[11] *Optum and Change Healthcare Complete Combination,* Optum Inc., https://www.optum.com/en/about-us/news/page.hub.optum-and-change-healthcare-complete-combination.html (last visited Mar. 29, 2024).
[12] *United States v. UnitedHealth Group Inc.*, No. 1:22-cv-0481 (CJN) (D.D.C. 2022).
[13] Defs.' Am. Pretrial Br. at 13, *United States v. UnitedHealth Group Inc.*, 630 F.Supp.3d 118 (D.D.C. 2022).

maintain its robust firewall processes and extend those processes to Change's business to protect sensitive customer data."[14] It further "offer[ed] contractual commitments to customers about the firewalls, data security policies, and products and services that UHG w[ould] make available post-transaction."[15] The DOJ eventually lost its challenge to UHG's acquisition of Change.

20. According to its Code of Conduct, Change promises that it is "committed to upholding the highest standards of business conduct. We do the right thing, the right way, every day."[16]

21. Healthcare data is highly sensitive in nature and is regulated by several federal, state, and international privacy laws that establish security standards and guidelines aimed at reducing the risk of data breaches and other cyberattacks that can cause serious harm to patients and the healthcare industry.[17]

22. As part of its regular business operations, Defendants retained and were entrusted with Private Information belonging to Plaintiff and the Class. Change acknowledges that its "operations and facilities are vulnerable to interruption and/or damage from a number of sources, many of which are beyond our control, including, without limitation: . . . cyber and ransomware attacks, computer viruses, hacking, break-ins, sabotage, intentional acts of vandalism and other

---

[14] *Id.* at 19.
[15] *Id.* at 48.
[16] Change Healthcare Inc., *supra* note 9 at 5.
[17] This includes, but is not limited to, the Health Insurance Portability and Accountability Act (HIPAA), Health Information Technology for Economic and Clinical Health Act (HITECH), Tennessee Information Protection Act (TIPA), Gramm–Leach–Bliley Act (GLBA), General Data Protection Regulation (GDPR), and other laws that regulate the privacy of healthcare information.

similar disruptive problems."[18] Particularly in light of these acknowledged risks, Defendants had the duty to safeguard and protect this Private Information in accordance with all applicable laws.

23. At all times relevant to this Complaint, Defendants knew, or should have known, of these regulations, guidelines, and their other legal obligations related to their collection, management, and use of Private Information.

24. Plaintiff and Class Members entrusted their Private Information to Change, its officials, and agents. Plaintiff and Class Members relied on Change to keep their Private Information secure and safeguarded against unauthorized access and disclosure to unauthorized persons. Change owed a duty to Plaintiff and Class Members to secure their Private Information and ultimately breached that duty, as Plaintiff's and Class Members' Private Information was compromised, unlawfully accessed, and exfiltrated due to the Data Breach.

### B. Despite its Promises, Defendants Failed to Maintain Reasonable and Adequate Security Measures to Safeguard Private Data.

25. Despite its promises, Change and its employees failed to properly monitor the computer network and systems in which the Private Information of Plaintiff and Class Members was maintained, and Change failed to detect and stop the Data Breach until it was too late. Had Change properly monitored its systems and employed appropriate security measures commensurate with the sensitivity of the Private Information, it would have either discovered the intrusion sooner or been able to prevent it entirely.

---

[18] Change Healthcare Inc., Annual Report (Form 10-K) at 31 (May 26, 2022), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001756497/000175649722000007/chng-20220331x10k.htm (last visited Mar. 29, 2024).

26. On or around February 21, 2024, Change experienced a data breach that compromised Plaintiff and Class Members' Private Information.[19]

27. Defendants' own statements confirmed that cybercriminals had accessed its systems. In a February 22, 2024 8-K filing with the Securities and Exchange Commission, UHG stated that a "suspected nation-state associated cyber security threat actor had gained access to some of the Change Healthcare information technology systems."[20] The breach caused Change to take its impacted systems offline.

28. In response to the Data Breach, on February 24, 2024, the American Hospital Association (AHA) issued a cybersecurity advisory, recommending that "all healthcare organizations that were disrupted or are potentially exposed by this incident consider disconnection from" the affected Change applications.[21] The AHA stated that, "**As of this date, Change Healthcare has not provided a specific timeframe for which recovery of the impacted applications is expected.**"[22]

29. On February 26, 2024, the AHA penned a public letter to the Department of Health and Human Services, expressing concern over the implications of the breach.[23] It called the Data Breach an "unprecedented attack against one of America's largest health care

---

[19] Optum, Inc., Optum Solution Status, https://solution-status.optum.com/incidents/hqpjz25fn3n7 (last visited Mar. 29, 2024).
[20] UnitedHealth Group Inc., Current Report (Form 8-K) (Feb. 22, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000731766/000073176624000045/unh-20240221.htm (last visited Mar. 29, 2024).
[21] *See* https://www.aha.org/2024-02-24-update-unitedhealth-groups-change-healthcares-continued-cyberattack-impacting-health-care-providers (last visited Mar. 29, 2024).
[22] *Id*. (emphasis in original).
[23] Richard J. Pollack, AHA Letter to HHS on Implications of Change Healthcare Cyberattack, Am. Hosp. Assoc., https://www.aha.org/lettercomment/2024-02-26-aha-letter-hhs-implications-change-healthcare-cyberattack (last visited Mar. 29, 2024).

companies [that] has already imposed significant consequences on hospitals and the communities they serve."[24]

30. The AHA stated that the 15 billion healthcare transactions processed annually by Change include a range of services that directly affect patient care, including clinical decision support, eligibility verifications and pharmacy operations[,]" all of which suffered disruptions because of the Data Breach.[25] The Data Breach also imperiled numerous providers' abilities to pay for care team salaries, necessary medicines and supplies, and critical contract work.[26]

31. On or about February 28, 2024, the ransomware group BlackCat/ALPHV claimed responsibility for the attack.[27] While the true extent of the compromise of Private Information remains unknown, on its leak site, BlackCat/ALPHV claimed to have stolen over 6 terabytes of Change's sensitive data, including, but not limited to: patients' names, Social Security Numbers, addresses, phone numbers, email addresses, medical and dental records, payment information, insurance claims information, and insurance records, as well as over 3,000 source code files for Change products.[28] BlackCat/ALPHV also claimed to have accessed sensitive data held by Change's partners, including but not limited to, Medicare, Tricare, CVS-CareMark, Loomis, Metlife, and many more.[29]

---

[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] Kerner, *supra* note 8.
[28] Helga Labus, *ALPHV/BlackCat threatens to leak data stolen in Change Healthcare cyberattack*, Help Net Security (Feb. 29, 2024), https://www.helpnetsecurity.com/2024/02/29/alphv-blackcat-change-healthcare/ (last visited Mar. 29, 2024).
[29] Brett Callow (@BrettCallow), X (Feb. 28, 2024, 10:30 AM), https://twitter.com/BrettCallow/status/1762893128326111404/photo/1 (last visited Mar. 29, 2024).

32. According to numerous media sources, Change made a payment of 350 bitcoins worth $22 million to a bitcoin cryptocurrency wallet associated with BlackCat/ALPHV. [30] However, media sources also indicate that the criminal affiliate who claims to have given BlackCat/ALPHV access to Change's network claims the ransomware group refused to share their share of the ransom, and still has the sensitive data Change reportedly paid the group to destroy."[31]

33. The breach caused substantial disruption to the Change platform and debilitated the millions of healthcare industry workers that used the platform directly or indirectly. The breach affected pharmacy transactions, individuals making health claims and filling prescriptions, and physicians' and hospitals' ability to bill, manage, and issue prescriptions and procedures.[32]

34. As of early March 2024, many healthcare providers had gone without revenue for several weeks and were struggling to operate amidst the abrupt halt in insurance reimbursements and prescription processing.[33] Change announced its pharmacy services were largely back online

---

[30] *See, e.g.,* Kerner, *supra* note 8.

[31] Andy Greenberg, *Hackers Behind the Change Healthcare Ransomware Attack Just Received a $22 Million Payment*, Wired (Mar. 4, 2024), https://www.wired.com/story/alphv-change-healthcare-ransomware-payment/ (last visited Mar. 29, 2024)

[32] Kerner, *supra* note 8.

[33] James Rundle et al., *Medical Providers Fight to Survive After Change Healthcare Hack*, Wall St. J. (Mar. 1, 2024), https://www.wsj.com/articles/medical-providers-fight-to-survive-after-change-healthcare-hack-328c2e5a?st=g686uuj8amda96z&reflink=mobilewebshare_permalink (last visited Mar. 29, 2024); *see also* Alison Kuznitz*, Mass. hospitals feeling fiscal pinch from Change Healthcare cyber breach*, WBUR (Mar. 12, 2024), https://www.wbur.org/news/2024/03/12/change-healthcare-cyber-attack-massachusetts (last visited Apr. 1, 2024) (the Data Breach is costing Massachusetts health care system about $24 million a day).

as of March 7, and its electronic funds transfer platform resumed on March 15.[34] Change then announced its claim preparation platform was back online as of March 18, and as of March 22, one month following announcement of the Data Breach, Change said $14 billion in claims were staged and ready for transmission.[35] Its largest clearinghouse, Relay Exchange, went back online on March 23, and Change announced it is working to make sure there is capacity to handle the surge in claims.[36] However, as of the end of March, many providers still had not been paid and had been forced to furlough staff or use their own money to pay employees.[37] Although the company launched an emergency funding program for medical providers via interest- and fee-free loans, the available loans are small compared to the size of providers' outstanding expenses. As of March 27, 2024, UHG claimed to have issued around $3.3 billion in loans.[38]

**C. The Data Breach was a Foreseeable Risk.**

35. The healthcare industry is a well-known target for cybercriminals due its possession of PHI and has been since the first ransomware attack involving a Trojan Horse virus sent to AIDS researchers in 1989.[39] Ransomware attacks on healthcare organizations more than

---

[34] James Rundle & Catherine Stuff, *Change Healthcare Hack: What You Need to Know*, Wall St. J. (Mar. 27, 2024), https://www.wsj.com/articles/change-healthcare-hack-what-you-need-to-know-45efc28c (last visited Apr. 1, 2024).

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *See* John Riggi, *Ransomware Attacks on Hospitals Have Changed*, Am. Hosp. Assoc., https://www.aha.org/center/cybersecurity-and-risk-advisory-services/ransomware-attacks-hospitals-have-changed (last visited Apr. 1, 2024).

doubled between 2016 and 2021 and, in this time period, exposed the PHI of nearly 42 million patients, and were more likely to affect large organizations with multiple facilities.[40]

36. Cybercriminals target the healthcare industry because of the sheer volume of highly sensitive personal data stored on their systems, and their ability to instill fear and disrupt daily life with the threat of stealing, misappropriating, and holding hostage such personal data.

37. Because ransomware attacks directly threaten a provider's ability to care for patients by putting patient safety at risk, the AHA has deemed these attacks "threat-to-life crimes."[41] In each of the past two years, ransomware accounted for over 70 percent of successful cyberattacks on the healthcare industry.[42]

38. BlackCat/ALPHV is a well-known group of cybercriminals with a history of targeting health industry organizations. In April 2022, the Federal Bureau of Investigation (FBI) published a Flash alert – an alert designed to help cybersecurity professionals and system administrators guard against malicious actions of cybercriminals – on BlackCat/ALPHV.[43]

39. The FBI, the Cybersecurity and Infrastructure Security Agency (CISA), and the Department of Health and Human Services (HHS) updated this alert with a joint advisory[44] released on December 19, 2023, following a BlackCat/ALPHV administrator's post to its

---

[40] *See* Hannah T. Neprash, *Trends in Ransomware Attacks on US Hospitals, Clinics, and Other Health Care Delivery Organizations, 2016-2021*, JAMA Health Forum (Dec. 29, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9856685/#:~:text=In%20this%20cohort%20study%20of,of%20nearly%2042%20million%20patients (last visited Apr. 1, 2024).

[41] Riggi, *supra* note 31.

[42] *Id*.

[43] FBI, *BlackCat/ALPHV Ransomware Indicators of Compromise*, FBI Cyber Division (Apr. 19, 2022), https://www.ic3.gov/Media/News/2022/220420.pdf (last visited Apr. 1, 2024).

[44] Change acknowledged the work of the CISA/FBI/HHS joint cybersecurity task force, noting on its Health Industry Insights page that the task force "recently highlighted increased ransomware activity targeted at healthcare data which is known to have impacted dozens of healthcare facilities." Suther, *supra* note 4.

affiliates encouraging them to target hospitals in December 2023. The advisory stated that "[s]ince mid-December 2023, of the nearly 70 leaked victims, the healthcare sector has been the most commonly victimized . . . FBI, CISA, and HHS encourage critical infrastructure organizations to implement the recommendations in the Mitigations section of this [Cybersecurity Advisory] to reduce the likelihood and impact of ALPHV Blackcat ransomware and data extortion incidents."[45]

40. At all relevant times, Defendants knew or should have known that its collection and retention of Private Information made it an attractive target for cybercriminals, especially in light of increased cyberattacks on the healthcare industry over the years.

41. Even prior to the FBI's updated advisory, as of May 26, 2022, Change was aware of this concerning trend, acknowledging that, "In recent years, there have been a number of well-publicized data breaches involving the improper dissemination of personal information of individuals both within and outside of the healthcare industry."[46]

42. Change was also aware that its infrastructure, data, and business operation systems experience unauthorized access of confidential information from time to time,[47] and acknowledged that its "products and services involve processing personal information. Like many organizations, [it has] been and expect[s] to routinely be the target of attempted cyber and other security threats by outside third parties, including technically sophisticated and well-resourced bad actors attempting to access or steal the data [it] store[s]."[48]

---

[45] Cybersec. & Infrastructure Sec. Agency, *#StopRansomware: ALPHV Blackcat* (Dec. 19, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-353a (last visited Apr. 1, 2024).
[46] Change Healthcare Inc., *supra* note 15.
[47] *Id.*
[48] *Id.* at 29.

43. Despite widespread public knowledge and dissemination of resources to safeguard Private Information and combat the unauthorized access of Private Information by cybercriminals within the healthcare industry, Defendants failed to exercise reasonable care in protecting the privacy and security of Plaintiff's and the Class's Private Information.

**D. Defendants Failed to Comply with Regulatory Guidance and Industry-Standard Cybersecurity Practice.**

44. Defendants' Data Breach is attributable to their failure to comply with state and federal laws and requirements as well as industry standards governing the protection of Private Information.

45. For example, at least 24 states have enacted laws addressing data security practices that require that businesses that own, license or maintain Private Information to implement and maintain "reasonable security procedures and practices" and to protect Private Information from unauthorized access.

46. Defendants failed to comply with Federal Trade Commission ("FTC") guidance on protecting PII and industry-standard cybersecurity practices. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, failing to use reasonable measures to protect PII by companies like Defendants. Several publications by the FTC outline the importance of implementing reasonable security systems to protect data. The FTC has made clear that protecting sensitive customer data should factor into virtually all business decisions.

47. The FTC recommends, among other things:

- limiting access to customer information to those who have a legitimate business need for it;
- encrypting customer information on system and in transit;
- implementing multi-factor authentication for anyone accessing customer information;

- implementing procedures and controls to monitor when authorized users are accessing customer information;
- maintaining up-to-date and appropriate programs and controls to prevent unauthorized access to customer information; and
- implementing procedures and controls to detect unauthorized access to customer information, including monitoring activity logs for signs of unauthorized access to customer information.[49]

48. The FTC has also issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[50]

49. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[51] The guidelines note businesses should protect the personal customer information that they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

50. The FTC recommends that businesses delete payment card information after the time needed to process a transaction; restrict employee access to sensitive customer information; require strong passwords be used by employees with access to sensitive customer information;

---

[49] *See* Fed. Trade Comm'n, *FTC Safeguards Rule: What Your Business Needs to Know*, https://www.ftc.gov/business-guidance/resources/ftc-safeguards-rule-what-your-business-needs-know (last visited Apr. 1, 2024).

[50] Fed. Trade Comm'n, *Start With Security: A Guide for Business* at 2 (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Apr. 1, 2024).

[51] Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Apr. 1, 2024).

apply security measures that have proven successful in the particular industry; and verify that third parties with access to sensitive information use reasonable security measures.[52]

51. The FTC also recommends that companies use an intrusion detection system to immediately expose a data breach; monitor incoming traffic for suspicious activity that indicates a hacker is trying to penetrate the system; monitor for the transmission of large amounts of data from the system; and develop a plan to respond effectively to a data breach in the event one occurs.[53]

52. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

53. The FTC has interpreted Section 5 of the FTC Act to encompass failures to appropriately store and maintain personal data.

54. Defendants were aware of their obligations to protect their customers' Private Information and privacy before and during the Data Breach yet failed to take reasonable steps to protect customers' Private Information from unauthorized access. In this case, Defendants were at all times fully aware of their obligation to protect the Private Information of its customers. Defendants were also aware of the significant repercussions if it failed to do so because Defendants collected Private Information from millions of consumers and it knew that this Private Information, if compromised, would result in injury to consumers, including Plaintiff and Class Members.

55. Based upon the known details of the Data Breach and how it occurred, Defendants also failed to fully comply with industry-standard cybersecurity practices.

56. Defendants are also covered Business Associates under HIPAA (45 C.F.R. § 160.103) and are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R.

[52] *Id.*
[53] *Id.*

Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

57. Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[54] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

58. HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

59. HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

60. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

61. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media [or] maintained in electronic media." 45 C.F.R. § 160.103.

62. HIPAA's Security Rule requires Defendants to do the following:

A. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

B. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

C. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

---

[54] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

D. Ensure compliance by its workforce.

63. HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information[.]" 45 C.F.R. § 164.306(e). Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights[.]" 45 C.F.R. § 164.312(a)(1).

64. HIPAA and HITECH also obligated Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) *and* § 164.306(a)(3); *see also* 42 U.S.C. §17902.

65. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendants to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following the discovery of a breach[.]"[55]

66. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

67. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

68. HIPAA also requires the Office of Civil Rights ("OCR") within the Department of

[55] U.S. Dep't of Health & Human Servs., *Breach Notification Rule* (July 26, 2013), https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited Apr. 1, 2024).

Health and Human Services ("HHS") to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule."[56] OCR's list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI."[57]

### E. Defendants' Failure to Adequately Protect Plaintiff's Private Information Caused Harm to Plaintiff.

69. Plaintiff Rowe has been a member of UHC since approximately 1993.

70. In exchange for paying a monthly premium, UHC provided Plaintiff Rowe with health insurance benefits.

71. As a condition of receiving health insurance benefits via UHC, Plaintiff Rowe has provided extremely sensitive Private Information – including treatment dates and diagnoses – to UHC for over 30 years.

72. Following the Data Breach, Defendants did not notify Plaintiff Rowe of the breach or that his Private Information had been compromised. In fact, as of April 3, 2024, Change had not yet sent notice to affected individuals of the Data Breach.

73. Plaintiff Rowe spent considerable time responding to the Data Breach, including monitoring his personal accounts for fraudulent activity and contacting his bank to have his debit card reissued.

74. Plaintiff Rowe's bank cancelled and reissued his debit card due to unauthorized

---

[56] U.S. Dep't of Health & Human Servs., *Security Rule Guidance Material* (Feb. 16, 2024), http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Apr. 1, 2024).

[57] U.S. Dep't of Health & Human Servs., *Guidance on Risk Analysis* (July 22, 2019), https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Apr. 1, 2024).

activity multiple times in late 2023 and most recently in February 2024, at or around Defendants' announcement of the Data Breach.

75. After the Data Breach, Plaintiff Rowe experienced a significant increase in unsolicited phone calls, text messages, and emails, including apparent attempts at identity theft and fraud such as phishing.

76. Plaintiff Rowe places significant value in the security of his Private Information. Plaintiff Rowe entrusted UHC and Defendants with his Private Information, with the understanding that Defendants would keep his Private Information secure and employ reasonable and adequate security measures to ensure that it would not be compromised.

77. Plaintiff Rowe is deeply concerned about the ways in which the theft of his highly sensitive Private Information may impact him, including with respect to the security of his other online accounts, his personal healthcare information, and the associated risks of identity theft, healthcare fraud, or other fraud related to the Private Information exposed in the Data Breach. In this regard, Plaintiff Rowe has suffered emotional distress as a result of the release of his Private Information, including anxiety, concern, and unease about unauthorized parties viewing, sharing, and misusing his Private Information. This emotional distress has been compounded by the fact that Defendants have still not fully informed him of key details about the Data Breach.

78. Defendants thus betrayed Plaintiff Rowe's trust and failed to properly maintain the privacy of his Private Information and prevent unauthorized access to that Private Information.

79. Given the highly-sensitive nature of the information stolen and its subsequent dissemination to unauthorized parties, Plaintiff Rowe has already suffered injury and remains at a substantial and imminent risk of future harm as a result of having his Private Information compromised in the Data Breach, including but not limited to: (i) lost or diminished value of his Private Information; (ii) lost opportunity costs associated with attempting to mitigate the consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; and (v) the substantial and imminent risk of future harm resulting from the disclosure of his Private Information in the Data Breach.

80. As a result of the Data Breach, Plaintiff Rowe is at a present risk and will continue to be at increased risk of identity theft and fraud, as well as other risks of harm related to the Private Information disclosed in the Data Breach, for years to come. Plaintiff Rowe therefore anticipates spending considerable time on an ongoing basis to attempt to mitigate and address harms caused by the Data Breach.

81. Plaintiff Rowe has a continuing interest in ensuring that his Private Information – which, upon information and belief, remains backed up in Defendants' possession – is protected and safeguarded from future breaches.

82. Plaintiff seeks to remedy these harms on behalf of all similarly situated individuals whose Private Information was accessed, compromised, and/or stolen during the Data Breach.

83. Accordingly, Plaintiff brings this action, on behalf of himself and all others similarly situated, against Defendants seeking redress for its unlawful conduct asserting claims on behalf of a nationwide class for (1) negligence, (2) negligence per se, (3) breach of implied contract, (4) unjust enrichment, and (5) declaratory judgment.

### F. The Data Breach Damaged Plaintiff and Class Members and Placed Their Confidential Private Information at Risk.

84. Defendants' failure to keep Plaintiff's and Class Members' Private Information secure has severe ramifications. Given the sensitive nature of the Private Information stolen in the Data Breach, cybercriminals can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury, including actual or attempted identity theft, fraud, or related cybercrimes due to the Data Breach.

85. Armed with the Private Information accessed in the Data Breach, data thieves can use that data to commit a variety of crimes, including using Class Members' Private Information to target other phishing and hacking intrusions based upon their individual health backgrounds.

86. Further, malicious actors often wait months or years to use the Private Information obtained in data breaches, as victims often become complacent and less diligent in monitoring

their accounts after a significant period has passed. These bad actors will also re-use stolen Private Information, meaning individuals can be the victim of several instances of identity theft, fraud, or other cybercrimes stemming from a single data breach. Moreover, although elements of some Plaintiff's and Class Members' data may have been compromised in other data breaches, the fact that the Breach centralizes the Private Information and identifies the victims as Defendants' consumers materially increases the risk to Plaintiff and the Class.

87. The U.S. Government Accountability Office determined that "stolen data may be held for up to a year or more before being used to commit identity theft" and that "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."[58] Moreover, there is often significant lag time between when a person suffers harm due to theft of their Private Information and when they discover the harm. Plaintiff will therefore need to spend time and money to continuously monitor his accounts for years to ensure his Private Information obtained in the Data Breach is not used to harm him. Plaintiff and Class Members thus have been harmed in the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendants' Data Breach. In other words, Plaintiff has been harmed by the value of identity protection services he must purchase in the future to ameliorate the risk of harm he now faces due to the Data Breach.

88. As such, these harms are ongoing, and Plaintiff and Class Members will suffer from future damages associated with the unauthorized use and misuse of their Private Information, as data thieves and malicious actors who purchase the stolen Private Information will continue to use the information to the detriment of Plaintiff and Class Members for many years to come.

89. As a direct result of the Data Breach, Plaintiff and Class Members have suffered actual and attempted identity theft and fraud, and they will continue to be exposed to a heightened and imminent risk of identity theft and fraud, potentially for the rest of their lives. Plaintiff and Class Members must now and in the future closely monitor their medical, insurance, and financial

[58] U.S. Gov't Accountability Off., *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO-07-737, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

accounts to guard against identity theft and fraud.

90. For this reason, Plaintiff and Class Members may incur out-of-pocket costs for purchasing protective measures to deter and detect identity theft and fraud, as well as protective measures to mitigate against the misuse of their genetic information and related Private Information.

91. As a direct and proximate result of the Data Breach and subsequent exposure of their Private Information, Plaintiff and Class Members have suffered, and will continue to suffer, damages and economic losses in the form of lost time needed to take appropriate measures to avoid the misuse of their Private Information, potential unauthorized and fraudulent charges, and dealing with spam phone calls, letters, text messages, and emails received as a result of the Data Breach and the unauthorized disclosure and misuse of their Private Information.

92. Plaintiff and Class Members have also realized harm in the lost or reduced value of their Private Information. Plaintiff's Private Information is not only valuable to Defendants, but Plaintiff also places high value on his Private Information based on his understanding that his Private Information is a financial asset to companies that collect it.[59]

93. Plaintiff and Class Members have also been harmed and damaged in the amount of the market value of the cybercriminals' access to Plaintiff's Private Information that was permitted without authorization by Defendants. This market value for access to Private Information can be determined by reference to both legitimate and illegitimate markets for such information.

94. Moreover, Plaintiff and Class Members value the privacy of this information and expect Defendants to allocate enough resources to ensure it is adequately protected. Plaintiff and other customers would not have done business with Defendants, provided their Private Information, or agreed to pay the health insurance premiums for Defendants' coverage had they

---

[59] *See, e.g.,* Ponemon Institute LLC, *Privacy and Security in a Connected Life: A Study of US, European and Japanese Consumers*, at 14, 17 (Mar. 2015), https://docplayer.net/836701-Privacy-and-security-in-a-connected-life-a-study-of-us-european-and-japanese-consumers.html (last visited Apr. 1, 2024) (explaining that 53% of respondents "believe personal data is a financial asset similar to traded goods, currencies or commodities" and valuing, as but one example, their Social Security number at $55.70).

known Defendants did not implement reasonable security measures to protect their Private Information. Customers reasonably expect that the payments they made to Defendants incorporate the costs to implement reasonable security measures to protect their Private Information. As a result, Plaintiff and Class Members did not receive the benefit of their bargain with Defendants because they paid a value for services they expected but did not receive.

95. Given Defendants' failure to protect Plaintiff's and the Class Members' Private Information, Plaintiff has a significant and cognizable interest in obtaining injunctive and equitable relief (in addition to any monetary damages, restitution, or disgorgement) that protects him from suffering further harm, as his Private Information remains in Defendants' possession. Accordingly, this action represents the enforcement of an important right affecting the public interest and will confer a significant benefit on a large class of persons.

96. In sum, Plaintiff and Class Members were injured as follows: (i) theft of their Private Information and the resulting loss of privacy rights in that information; (ii) improper disclosure of their Private Information; (iii) loss of value of their Private Information; (iv) the lost value of access to Plaintiff's and Class Members' Private Information permitted by Defendants; (v) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendants' Data Breach; (vi) Defendants' retention of profits attributable to Plaintiff's and Class Members' Private Information that Defendants failed to adequately protect; (vii) the certain, imminent, and ongoing threat of fraud and identity theft, including the economic and non-economic impacts that flow therefrom; (viii) ascertainable out-of-pocket expenses and the value of their time allocated to fixing or mitigating the effects of the Data Breach; (ix) overpayments to Defendants for services purchased, as Plaintiff reasonably believed a portion of the sale price would fund reasonable security measures that would protect his Private Information, which was not the case; and (x) nominal damages.

## V. CLASS ACTION ALLEGATIONS

Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seeks certification of the following nationwide class (the "Nationwide Class" or the "Class"):

> **All natural persons residing in the United States whose Private Information was exfiltrated in the Data Breach.**

97. The Nationwide Class asserts claims against Defendants for negligence (Count 1), negligence per se (Count 2), breach of implied contract (Count 3), unjust enrichment (Count 4), and declaratory judgment (Count 5).

98. **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The Class Members are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, Defendants have acknowledged that millions of individuals' Private Information has been compromised. Those individuals' names and addresses are available from Defendants' records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods. On information and belief, there are at least thousands of Class Members, making joinder of all Class Members impracticable.

99. **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members. The common questions include:

1. Whether Defendants had a duty to protect Private Information;
2. Whether Defendants failed to take reasonable and prudent security measures to ensure the Private Information it maintains was protected;
3. Whether Defendants failed to take available steps to prevent and stop the Data Breach from happening;
4. Whether Defendants knew or should have known that the Private Information it maintains was vulnerable to compromise;
5. Whether Defendants were negligent in failing to implement reasonable and adequate security procedures and practices;

6. Whether Defendants' security measures to protect the Private Information it maintains were reasonable in light known legal requirements;

7. Whether Defendants' conduct constituted unfair or deceptive trade practices;

8. Whether Defendants violated state or federal law when it failed to implement reasonable security procedures and practices;

9. Which security procedures and notification procedures Defendants should be required to implement;

10. Whether Defendants have a contractual obligation to provide for the security of customer Private Information;

11. Whether Defendants have complied with any contractual obligations to protect customer Private Information;

12. What security measures, if any, must be implemented by Defendants to comply with its contractual obligations;

13. Whether Defendants violated state consumer protection laws in connection with the actions described herein;

14. Whether Defendants failed to notify Plaintiff and Class Members as soon as practicable and without delay after the Data Breach was discovered;

15. Whether Defendants' conduct resulted in or was the proximate cause of the loss of the Private Information of Plaintiff and Class Members;

16. Whether Plaintiff and Class Members were injured and suffered damages or other losses because of Defendants' failure to reasonably protect their Private Information;

17. Whether Defendants should retain the money paid by Plaintiff and Class Members to protect their Private Information;

18. Whether and how Defendants should retain Plaintiff's and Class Members' valuable Private Information; and,

19. Whether Plaintiff and Class Members are entitled to damages or injunctive relief.

100. **Typicality: Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way. Plaintiff's Private Information was in Defendants' possession at the time of the Data Breach and was compromised as a result of the Data Breach. Plaintiff's damages and injuries are akin to those of other Class Members, and

Plaintiff seeks relief consistent with the relief of the Class.

101. **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate Class representative because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendants to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's Counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

102. **Predominance & Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual issues because those issues discussed in the above paragraph on commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

103. **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual proposed Class Members would create the risk of inconsistent adjudications and incompatible standards of conduct for Defendants or would be dispositive of the interests of members of the proposed Class.

104. **Ascertainability.** The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class. The Class consists of individuals who provided their Private Information to Change. Class Membership can be determined using Change's records.

105. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendants, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive relief appropriate to the Class as a whole. Injunctive relief is necessary to uniformly protect the Class Members' data. Plaintiff seeks prospective injunctive relief as a wholly separate remedy from any monetary relief.

106. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## VI. CAUSES OF ACTION

### COUNT ONE — NEGLIGENCE

### On Behalf of Plaintiff and the Nationwide Class

107. Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

108. Defendants required Plaintiff and Class Members to submit sensitive Private Information in order to obtain its services.

109. Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting their Private Information in its possession from being compromised, lost, stolen, accessed or misused by unauthorized persons. More specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendants' security systems to ensure that Plaintiff's and Class Members' Private Information in Defendants' possession was adequately secured and protected; (b) implementing processes that would detect unauthorized access to the Private Information it maintains in a timely manner;

(c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding unauthorized access to the Private Information it maintains; and (d) maintaining data security measures consistent with industry standards.

110. Defendants' duty to use reasonable care arose from several sources, including but not limited to those described herein.

111. Defendants had common law duties to prevent foreseeable harm to Plaintiff and the Class Members. These duties existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices. Not only was it foreseeable that Plaintiff and Class Members would be harmed by Defendants' failure to protect their Private Information because hackers routinely attempt to steal such information and use it for nefarious purposes, Defendants knew that it was more likely than not Plaintiff and other Class Members would be harmed if Defendants allowed such a breach.

112. Defendants' duty to use reasonable security measures also arose as a result of the special relationship that existed between Defendants, on the one hand, and Plaintiff and Class Members, on the other hand. The special relationship arose because Plaintiff and Class Members entrusted Defendants with their highly sensitive Private Information as part of the purchase of the health insurance offered by Defendants. Defendants alone could have ensured that their security systems and data storage architecture were sufficient to prevent or minimize the Data Breach.

113. Defendants' duty also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect Private Information by companies such as Defendants. Various FTC publications and data security breach orders further form the basis of Defendants' duty. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

114. Defendants' duty also arose from their superior positions to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

115. Defendants admit that they have a responsibility to protect the Private Information

with which it is entrusted.

116. Defendants knew or should have known that their data storage architecture were vulnerable to unauthorized access and targeting by cybercriminals for the purpose of stealing and misusing confidential Private Information.

117. Defendants also had a duty to safeguard the Private Information of Plaintiff and Class Members and to promptly notify them of a breach because of state laws and statutes that require Defendants to reasonably safeguard sensitive Private Information, as detailed herein.

118. Timely, adequate notification was required, appropriate and necessary so that, among other things, Plaintiff and Class Members could take appropriate measures to freeze or lock their credit profiles, avoid or mitigate identity theft or fraud, cancel or change usernames and passwords on compromised accounts, monitor their account information and credit reports for fraudulent activity, obtain credit monitoring services, and take other steps to mitigate or ameliorate the damages caused by Defendants' misconduct.

119. Defendants breached the duties they owed to Plaintiff and Class Members described above and thus were negligent. Defendants breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the Private Information of Plaintiff and Class Members; (b) detect the Data Breach while it was ongoing; (c) maintain security systems consistent with industry standards during the period of the Data Breach; (d) comply with regulations protecting the Private Information at issue during the period of the Data Breach; and (e) disclose in a timely and adequate manner that Plaintiff's and the Class Members' Private Information in Defendants' possession had been or was reasonably believed to have been stolen or compromised.

120. But for Defendants' wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their Private Information would not have been compromised.

121. Defendants' failure to take proper security measures to protect the sensitive Private Information of Plaintiff and Class Members created conditions conducive to a foreseeable, intentional act, namely the unauthorized access of Plaintiff's and Class Members' Private

Information.

122. Plaintiff and Class Members were foreseeable victims of Defendants' inadequate data security practices, and it was also foreseeable that Defendants' failure to provide timely and adequate notice of the Data Breach would result in injury to Plaintiff and Class Members as described in this Complaint.

123. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen Private Information; illegal sale of the compromised Private Information on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the Private Information; lost value of access to their Private Information permitted by Defendants; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendants' Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages and other economic and non-economic harm.

## COUNT TWO — NEGLIGENCE *PER SE*

**On Behalf of Plaintiff and the Nationwide Class**

124. Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

125. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the

Federal Trade Commission ("FTC"), the unfair act or practice by companies such as Defendants of failing to use reasonable measures to protect Private Information.

126. The FTC publications and orders also form the basis of Defendants' duty.

127. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information it obtained, stored, and disseminated, and the foreseeable consequences of a data breach involving the highly sensitive Private Information it maintains, including specifically the damages that would result to Plaintiff and Class Members.

128. In addition, under state data security statutes, Defendants had a duty to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and Class Members' Private Information.

129. Defendants' violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence per se.

130. Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

131. The harm that has occurred is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

132. Defendants breached their duties to Plaintiff and Class Members under the FTC Act and state data security statutes by failing to provide fair, reasonable, or adequate data security practices to safeguard Plaintiff's and Class Members' Private Information.

133. Plaintiff and Class Members were foreseeable victims of Defendants' violations of the FTC Act and state data security statutes. Defendants knew or should have known that their failure to implement reasonable measures to protect and secure Plaintiff's and Class Members' Private Information would cause damage to Plaintiff and Class Members.

134. But for Defendants' violation of the applicable laws and regulations, Plaintiff's and Class Members' Private Information would not have been accessed by unauthorized parties.

135. As a direct and proximate result of Defendants' negligence per se, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen Private Information; illegal sale of the compromised Private Information on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the Private Information; lost value of access to their Private Information permitted by Defendants; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendants' Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

## COUNT THREE — BREACH OF IMPLIED CONTRACT

### On Behalf of Plaintiff and the Nationwide Class

136. Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

137. Plaintiff and Class Members entered into an implied contract with Defendants when they obtained services from Defendants, or otherwise provided Private Information to Defendants.

138. As part of these transactions, Defendants agreed to safeguard and protect the Private Information of Plaintiff and Class Members and to timely and accurately notify them if their Private Information was breached or compromised.

139. Plaintiff and Class Members entered into the implied contracts with the reasonable expectation that Defendants' data security practices and policies were reasonable and consistent with legal requirements and industry standards. Plaintiff and Class Members believed that Defendants would use part of the monies paid to Defendants under the implied contracts or the monies obtained from the benefits derived from the Private Information they provided to fund adequate and reasonable data security practices.

140. Plaintiff and Class Members would not have provided and entrusted their Private Information to Defendants, or would have paid less for Defendants' products or services, in the absence of the implied contract or implied terms between them and Defendants. The safeguarding of the Private Information of Plaintiff and Class Members was critical to realize the intent of the parties.

141. Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendants.

142. Defendants breached their implied contracts with Plaintiff and Class Members to protect their Private Information when Defendants (1) failed to take reasonable steps to use safe and secure systems to protect that information; and (2) disclosed that information to unauthorized third parties.

143. As a direct and proximate result of Defendants' breach of implied contract, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen Private Information; illegal sale of the compromised Private Information on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased

credit scores and ratings; lost work time; lost value of the Private Information; lost value of access to their Private Information permitted by Defendants; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendants' Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

**COUNT FOUR — UNJUST ENRICHMENT**

**On Behalf of Plaintiff and the Nationwide Class**

144. Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

145. Plaintiff and Class Members have an interest, both equitable and legal, in the Private Information about them that was conferred upon, collected by, and maintained by Defendants and that was ultimately stolen in the Data Breach.

146. Defendants were benefitted by the conferral upon them of the Private Information pertaining to Plaintiff and Class Members and by their ability to retain, use, and profit from that information. Defendants understood that they were in fact so benefitted.

147. Defendants also understood and appreciated that the Private Information pertaining to Plaintiff and Class Members was private and confidential and its value depended upon Defendants maintaining the privacy and confidentiality of that Private Information.

148. But for Defendants' willingness and commitment to maintain its privacy and confidentiality, that Private Information would not have been transferred to and entrusted to Defendants.

149. Because of their use of Plaintiff's and Class Members' Private Information, Defendants sold more services than they otherwise would have. Defendants were unjustly enriched by profiting from the additional services they were able to market, sell, and create to the detriment of Plaintiff and Class Members.

150. Defendants also benefitted through their unjust conduct by retaining money that

they should have used to provide reasonable and adequate data security to protect Plaintiff's and Class Members' Private Information.

151. Defendants also benefitted through their unjust conduct in the form of the profits they gained through the use of Plaintiff's and Class Members' Private Information.

152. It is inequitable for Defendants to retain these benefits.

153. As a result of Defendants' wrongful conduct as alleged in this Complaint (including among things their failure to employ adequate data security measures, their continued maintenance and use of the Private Information belonging to Plaintiff and Class Members without having adequate data security measures, and their other conduct facilitating the unauthorized disclosure of that Private Information), Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class Members.

154. Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiff's and Class Members' sensitive Private Information, while at the same time failing to maintain that information secure from unauthorized access by hackers and identity thieves.

155. It is inequitable, unfair, and unjust for Defendants to retain these wrongfully obtained benefits. Defendants' retention of wrongfully obtained monies would violate fundamental principles of justice, equity, and good conscience.

156. The benefit conferred upon, received, and enjoyed by Defendants was not conferred officiously or gratuitously, and it would be inequitable, unfair, and unjust for Defendants to retain the benefit.

157. Defendants' defective security and their unfair and deceptive conduct have, among other things, caused Plaintiff and Class Members to unfairly incur substantial time and/or costs to mitigate and monitor the use of their Private Information and have caused Plaintiff and Class Members other damages as described herein.

158. Plaintiff and the Class Members have no adequate remedy at law.

159. Defendants are therefore liable to Plaintiff and Class Members for restitution or

disgorgement in the amount of the benefit conferred on Defendants as a result of their wrongful conduct, including specifically: the value to Defendants of the Private Information that was stolen in the Data Breach; the profits Defendants received and are receiving from the use of that information; the amounts that Defendants overcharged Plaintiff and Class Members for use of Defendants' products and services; and the amounts that Defendants should have spent to provide reasonable and adequate data security to protect Plaintiff's and Class Members' Private Information.

## COUNT FIVE — DECLARATORY JUDGMENT

### On Behalf of Plaintiff and the Nationwide Class

160. Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

161. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. The Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

162. An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard their customers' Private Information and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their Private Information. Plaintiff continues to suffer injury as a result of the compromise of Plaintiff's Private Information and remain at imminent risk that further compromises of his Private Information will occur in the future given the publicity around the Data Breach and the nature and quantity of the Private Information stored by Defendants.

163. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants continue to owe a legal duty to secure consumers' Private Information and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various state statutes;

b. Defendants continue to breach this legal duty by failing to employ reasonable measures to secure consumers' Private Information.

164. The Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect consumers' Private Information.

165. If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Change. The risk of another such breach is real, immediate, and substantial. If another breach at Change occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and Plaintiff will be forced to bring multiple lawsuits to rectify the same conduct.

166. The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another significant data breach occurs at Change, Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

167. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Change, thus eliminating the additional injuries that would result to Plaintiff and the millions of consumers whose confidential information would be further compromised.

## VII. PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants, as follows:

1. That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's Counsel as Class Counsel;

2. That the Court grant permanent injunctive relief to prohibit Change from continuing to engage in the unlawful acts, omissions, and practices described herein, including;

a. Prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

b. Requiring Defendants to protect all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

c. Requiring Defendants to delete, destroy and purge the Private Information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

d. Requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' Private Information;

e. Requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

f. Requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

g. Requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

h. Requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon employees' respective responsibilities with handling Private Information, as well as protecting the Private Information of Plaintiff and Class Members;

i. Requiring Defendants to routinely and continually conduct internal training and education, at least annually, to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

j. Requiring Defendants to implement a system of testing to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs and systems for protecting Private Information;

k. Requiring Defendants to implement, maintain, regularly review and revise as necessary, a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

l. Requiring Defendants to meaningfully educate all Class Members about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps affected individuals must take to protect themselves;

m. Requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and

n. Appointing a qualified and independent third-party assessor to conduct for a period of 10 years a SOC 2 Type 2 attestation to evaluate on an annual basis Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies in compliance with the Court's final judgment.

3. That the Court award Plaintiff and Class Members compensatory, consequential, general, and nominal damages in an amount to be determined at trial;

4. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

5. That the Court award statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

6. That Plaintiff be granted the declaratory relief sought herein;

7. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

8. That the Court award pre-judgment and post-judgment interest at the maximum legal rate; and

9. That the Court grant all such other relief as it deems just and proper.

## VIII. JURY TRIAL

Plaintiff demands a jury trial on all claims so triable.

RESPECTFULLY SUBMITTED this 3rd day of April, 2024.


s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV, BPR 23045
Michael Iadevaia, BPR 041622
Emily Schiller, BPR 039387
**STRANCH, JENNINGS & GARVEY PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801
gstranch@stranchlaw.com
miadevaia@stranchlaw.com
eschiller@stranchlaw.com

Cari Campen Laufenberg*
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384
claufenberg@kellerrohrback.com

Christopher L. Springer*
**KELLER ROHRBACK L.L.P.**
801 Garden Street
Suite 301
Santa Barbara, CA 93101
Tel: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Attorneys for Plaintiff*

**Pro Hac Vice application forthcoming*